John M. Peebles (SBN 237582)
Steven J. Bloxham (SBN 96384)
James Qaqundah (SBN 270700)
Fredericks Peebles & Morgan LLP
2020 L Street, Suite 250
Sacramento, CA 95811
Telephone:  (916) 441-2700
Facsimile:  (916) 441-2067
jpeebles@ndnlaw.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| PICAYUNE RANCHERIA OF CHUKCHANSI INDIANS, a Federally-recognized Indian Tribe; MORRIS REID; DORA JONES; DIXIE JACKSON; HAROLD M. HAMMOND, SR.; MARK EMERICK; and JANICE DEVINE,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; SALLY JEWELL, Secretary, U.S. Department of the Interior; KEVIN WASHBURN, Assistant Secretary for Indian Affairs, U.S. Department of the Interior; NATIONAL INDIAN GAMING COMMISSION; JONODEV OSCEOLA CHAUDHURI, Acting Chairman, National Indian Gaming Commission; EDMUND G. BROWN, Governor, State of California; KAMALA HARRIS, Attorney General, State of California, CALIFORNIA GAMBLING CONTROL COMMISSION; TINA LITTLETON, Executive Director, California Gambling Control Commission; and CALIFORNIA BUREAU OF GAMBLING CONTROL; WAYNE J. QUINT, JR., Bureau Chief, California Bureau of Gambling Control,<br><br>Defendants. | Case No.<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Administrative Procedure Act Case** |

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

Plaintiffs Picayune Rancheria of Chukchansi Indians and Tribal members Morris Reid, Dora Jones, Dixie Jackson, Harold M. Hammond, Sr., Mark Emerick, and Janice Devine, individually, as members of the last validly-elected Tribal Council (the 2011 and 2012 Tribal Councils), as members of the last undisputed Tribal Council (the "2010 Tribal Council"), as the last validly-appointed Director of the Tribe's Gaming Commission, as Tribal members, and as citizens of the State of California, submit this Complaint against Defendants the United States Department of the Interior (the "Department"), Sally Jewell in her capacity as Secretary of the Department, Kevin Washburn, in his capacity as Assistant Secretary – Indian Affairs for the Department, the National Indian Gaming Commission ("NIGC"), Jonodev Osceola Chaudhuri, in his capacity as Acting Chairman of the NIGC, Edmund G. Brown in his capacity as the Governor of the State of California (the "Governor"), Kamala Harris in her capacity as the Attorney General of the State of California (the "Attorney General"), the California Gambling Control Commission (the "CGCC"), Tina Littleton, in her capacity as the Executive Director of the CGCC, and the California Bureau of Gambling Control ("BGC") and state and allege as follows:

## INTRODUCTION

1.      Plaintiffs seek declaratory and injunctive relief against the United States Department of the Interior and its officials (the "Department"), the National Indian Gaming Commission and its officials (the "NIGC"), and the State of California and its officials ("California") under the Administrative Procedure Act, the Indian Gaming Regulatory Act, and the Mandamus and Venue Act seeking mandamus and related relief compelling the Department, the NIGC, and California to comply with their respective obligations under federal law to administer and maintain a government-to-government relationship with the Tribe and to take all actions as may be required by statute pursuant thereto, specifically including legal obligations under the Indian Gaming Regulatory Act.

2.      This case arises from the United States' and California's effort to shirk their legal responsibilities because of an intramural tribal dispute that arose in December 2011 under Tribal law. This action does not involve those tribal issues and does not question the propriety of tribal actions. At issue instead is whether the Secretary acted unlawfully in suspending the United States'

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

government-to-government relationship with Picayune Rancheria for over two-and-a-half years, and whether Indian gaming by an entity that is not recognized by the Department as the Tribe's governing body or its designated officials is unlawful, and whether the NIGC and California acted unlawfully by allowing and failing to take enforcement action with respect to class III gaming on Indian lands for over two-and-a-half years by persons other than a federally-recognized Indian tribal government or its designated officials.

3.    Plaintiffs neither seek nor desire to have this court resolve the Tribe's intramural dispute, which is a matter for the members of Picayune Rancheria to resolve under their law. Plaintiffs instead seek to prevent the United States and its officials and California and its officials from their continued use of the intramural Tribal dispute as an excuse to abandon both federal trust responsibilities to the Tribe and its members and federal statutory responsibilities in violation of federal law.

4.    Plaintiffs' claims arise from the Department's refusal to recognize any person or persons with whom to administer and maintain the Tribal-Federal relation on an interim basis, as required by the Department's own policies and practices and by federal law.  The Department's inaction has created an impermissible hiatus in the administration and maintenance of the United States' responsibilities to the Tribe, a hiatus the Department's own officials concede.

5.    The Department's failure to effectively recognize anyone to administer and maintain the Tribal-Federal relationship on an interim basis during the intramural tribal dispute means that the Tribe's multimillion dollar gaming business continues to be operated by persons lacking federal authority to do so in an unregulated environment to the detriment of both the public and Tribal welfares and in violation of federal law.

6.    Plaintiffs' claims also arise from the NIGC's arbitrary and capricious abdication of its obligations under the Indian Gaming Regulatory Act to regulate class II and class III gaming activities at the Tribe's casino and to prevent unlawful gaming activities being conducted that threaten the safety and well-being of Tribal members and the public alike.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

7.     Plaintiffs' claims also arise from California's abdication of its obligations under the Indian Gaming Regulatory Act to enforce the Tribal-State Compact between the State of California and the Picayune Rancheria and to prevent unlawful gaming activities being conducted that threaten the safety and well-being of Tribal members and the California public alike.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and laws of the United States, including U.S. Const. Art. I, § 8, cl. 3 (Indian commerce clause); U.S. Const. Amend. V (due process clause); the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. and § 701 et seq.; 28 U.S.C. §§ 2201 and 2202 (declaratory judgments); 28 U.S.C. § 1651 (the All Writs Act); 43 U.S.C. § 1451 et seq. (establishment and responsibilities of the Department of the Interior); the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq.; and federal common law.

9.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1361 because this is a civil action in the nature of mandamus seeking to compel an officer or employee of the United States or an agency thereof to perform a duty owed to the Plaintiffs, which duty arises under the Constitution and laws of the United States, including but not necessarily limited to the provisions previously described.

10.     The sovereign immunity of the United States has been waived with respect to the subject matter of this action and the relief requested herein by the APA. 5 U.S.C. § 702.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 84(a), 1391(a), and 1391(e), in that this is a civil action against the United States, agencies of the United States, United States officials, and employees of the United States or agencies, thereof each acting in his or her official capacity or under color of legal authority, as well as residents of the State of California, and a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated, and/or one or more plaintiff resides within the judicial district of the Northern District of California.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

**PARTIES**

12.     Plaintiff **Picayune Rancheria of the Chukchansi Indians** is a federally-recognized Indian tribe that possesses a government-to-government relationship with the United States that is eligible to receive services from the United States Department of the Interior Bureau of Indian Affairs. 79 Fed. Reg. 4748 (Jan. 29, 2014).

13.     Plaintiffs **Morris Reid, Dora Jones, Dixie Jackson, Harold M. Hammond, Sr.**, **Mark Emerick,** and **Janice Devine** (the "Individual Plaintiffs") are American Indians, citizens of the State of California, and enrolled members of Picayune Rancheria who are entitled under federal law to receive per capita distributions from the Tribe's Indian gaming revenues as well as services from the U.S. Bureau of Indian Affairs based on the United States government-to-government relationship with the Picayune Rancheria.  Each of the Individual Plaintiffs has been deprived of their per capita distributions, and services from the U.S. Bureau of Indian Affairs, as a result of the allegations herein.

14.     Plaintiffs **Morris Reid, Dora Jones, and Dixie Jackson** are the persons last undisputedly elected to three of four open seats on the Tribe's governing body, the Tribal Council, in a Tribal election conducted on December 3, 2011.  The Tribal Council elected in the December 3, 2011 election is known as the "2011 Tribal Council."

15.     Plaintiff **Harold M. Hammond, Sr.** was one of the four candidates receiving the highest number of votes in the December 3, 2011 Tribal election and, on that basis, asserts membership on the 2011 Tribal Council.  *See* Certified Election Results, a true and complete copy of which is attached hereto as **Exhibit 1.**  After the election, however, a dispute arose over the election of Mr. Hammond leading to an intramural leadership dispute in which the composition of the Tribal Council has been in dispute since December 26, 2011 and continuing to the present.  For background purposes, a discussion of the intramural leadership dispute can be found in a February 11, 2014 decision by the Bureau of Indian Affairs ("BIA") Pacific Regional Director, a true and complete copy of which is attached hereto as **Exhibit 2**.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

16.     Plaintiffs **Morris Reid and Dora Jones** are undisputed members of the last undisputed governing body, known as the "2010 Tribal Council," which was recognized for government-to-government purposes in the BIA Pacific Regional Director's February 11, 2014 decision (Ex. 2).

17.     Plaintiff **Mark Emerick** is the last validly-appointed and last undisputed Executive Director of the Picayune Rancheria's Tribal Gaming Commission, having been appointed in or around October 2010.  As the Executive Director of the Tribal Gaming Commission, Executive Director Emerick has the authority and legal obligation, *inter alia*, to implement and enforce the Tribe's Gaming Ordinance, IGRA, the Tribal Minimum Internal Control Standards, the Tribal-State Gaming Compact, and the regulations of the Tribal Gaming Commission; to report violations of the Gaming Ordinance, Tribal-State Compact, or IGRA to the State and Federal gaming agencies, to issue an Temporary Order of Closure if immediate closure is necessary to protect public safety and gaming assets, and to request assistance from the State Gaming Agency to enforce the Tribe's Gaming Ordinance and Tribal-State Compact.

18.     Defendant **Sally Jewell** is sued in her official capacity as the Secretary of the United States Department of the Interior ("Secretary").  The Secretary is the chief executive officer of the United States Department of the Interior. As the Secretary of the Interior, Secretary Jewell is legally obligated to administer and maintain the United States' government-to-government relations with federally-recognized Indian tribes.

19.     Defendant **Kevin Washburn** is sued in his official capacity as the Assistant Secretary of the United States Department of the Interior for Indian Affairs ("ASIA").  The ASIA is authorized to exercise all of the authority of the Secretary with respect to Indian Affairs.

20.     Defendant **United States Department of the Interior** (the "Department") is an executive agency of the United States government, established and organized pursuant to 43 U.S.C. § 1451 et seq. Congress has delegated authority over Indian affairs to the Department of the Interior and the Secretary. 43 U.S.C. § 1457(10).

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

21.     Defendant **Jonodev Osceola Chaudhuri** is sued in his official capacity as the Acting Chairman of the National Indian Gaming Commission ("Chairman").   The Chairman is the chief executive officer of the NIGC.

22.     Defendant **National Indian Gaming Commission** is an independent executive agency of the United States government, established and organized pursuant to the Indian Gaming Regulatory Act within the Department of Interior, 25 U.S.C. 2701 *et seq.*   The NIGC has certain statutory enforcement powers and responsibilities under the Indian Gaming Regulatory Act, including but not limited to the power and responsibility to approve or disapprove tribal gaming ordinances and amendments to such gaming ordinances, issue temporary closure orders, and levy and collect civil fines.

23.     Defendant **Edmund G. Brown** is the current Governor of California, with offices located at California State Capitol Building, 1315 10th Street, Sacramento, CA 95814, and is sued here in his official capacity.   As the context may require, all references herein to the Governor prior to the date Governor Brown took office refer to his predecessors in office, in their official capacities.

24.     Defendant **Kamala Harris** (the "Attorney General") is the current Attorney General of California, with offices located at 1300 I Street Sacramento, CA 95814, and is sued here in her official capacity.   As the context may require, all references herein to the Attorney General prior to the date Attorney General Harris took office refer to her predecessors in office, in their official capacities.

25.     Defendant **California Gambling Control Commission ("CGCC")** is an executive agency of the California State government, established and organized pursuant to California Business and Professions Code ("Cal. Bus. & Prof. Code") § 19811 et seq., with offices located at 2399 Gateway Oaks Drive, Suite 220, Sacramento, CA 95833.   The CGCC has various fiduciary, regulatory and administrative responsibilities related to Tribal gaming under IGRA pursuant to the Tribal-State Gaming Compacts, the California Gambling Control Act, the Governor's Executive Order D-31-01 and Governor's Executive Order D-66-03.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

26.     Defendant **Tina Littleton** is the Executive Director of the California Gambling Control Commission ("CGCC Executive Director"), with offices located at 2399 Gateway Oaks Drive, Suite 220, Sacramento, CA 95833, and is sued here in her official capacity.  By Cal. Bus. & Prof. Code § 19816(b), the Executive Director is the Commission's executive officer and shall carry out and execute the duties as specified by law and by the commission.  As the context may require, all references herein to the CGCC Executive Director prior to the date Executive Director Littleton took office refer to her predecessors in office, in their official capacities.

27.     Defendant **California Bureau of Gambling Control** ("BGC") is an executive agency of the California State government established and organized under the Office of the Attorney General with offices located at 4949 Broadway, Room E-231, Sacramento, CA 95820.  The BGC is the State law enforcement authority with special jurisdiction over gambling activities within the State of California.

28.     Defendant **Wayne J. Quint, Jr.**, is the Bureau Chief of the California Bureau of Gambling Control ("BGC Chief"), with offices located at 4949 Broadway, Room E-231, Sacramento, CA 95820, and is sued here in his official capacity.  Pursuant to Cal. Bus. & Prof. Code § 19805(d), the BGC Chief is the head of the BGC that is responsible for fulfilling the obligations imposed upon the BGC.  As the context may require, all references herein to the BGC Chief prior to the date BGC Chief took office refer to his predecessors in office, in their official capacities.

## FACTS

### Background Regarding Picayune Rancheria of Chukchansi Indians

29.     Picayune Rancheria is a federally-recognized Indian tribe possessing a government-to-government relationship with the United States that is eligible to receive services from the United States Bureau of Indian Affairs. 79 Fed. Reg. 4748 (Jan. 29, 2014).

30.     The Tribe is the beneficial owner of the Picayune Rancheria, reservation land located in Madera County, California, title to which is held in trust by the United States for the benefit of the Tribe (the "Reservation").  The Reservation is "Indian Country" within the meaning of federal law, e.g., 18 U.S.C. § 1151, and is "Indian lands" within the meaning of IGRA, 25 U.S.C. § 2703(4).

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES & MORGAN LLP 2020 L ST., STE 250 SACRAMENTO, CA 95811

31.     By virtue of the United States' government-to-government relationship with the Tribe, the Tribe receives federal monies to fund various federal and tribal programs, including funds for government services provided under contracts entered into between the Tribe and the United States pursuant to the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 et seq.

32.     Pursuant to the Tribe's Constitution, the governing body of the Tribe is the Tribal Council. *See* Constitution, Art. IV, § 2, a true and complete copy of which is attached hereto as **Exhibit 3**. The Tribal Council is made up of seven members. *Id.* Under the Tribe's Constitution and the Tribe's Election Ordinance, a true and complete copy of which is attached hereto as **Exhibit 4**, the members of the Tribal Council are elected to two-year terms in an annual election held on the first Saturday of December each year. Constitution (**Ex. 3**), Art. VII, § 4(c); *Election Ordinance* (**Ex. 4**), Art. IV, § 1. The General Council is made up "of all enrolled members of the Tribe, 18 years of age or older." *Constitution* (**Ex. 3**), Art. IV.

33.     On or about December 26, 2011, an intramural political dispute erupted within the Tribe over the results of a December 3, 2011 Tribal election.

34.     The Tribal dispute arose on or about December 26, 2011, after individual Plaintiffs Morris Reid, Dora Jones, Dixie Jackson, and Harold M. Hammond, Sr. were elected to the Tribal Council's majority in a Tribal election held on December 3, 2011. *See* Certified Election Results, **Ex. 1**. After the election, certain members of the incumbent 2010 Tribal Council disputed the seating of the individual Plaintiffs, giving rise to a dispute over the composition of the Tribe's governing body, the Tribal Council, which continues to the present. As noted above, a more detailed description of the intramural Tribal dispute is contained in a Decision, dated February 11, 2014, by Bureau of Indian Affairs Pacific Regional Director Amy Dutschke, **Ex. 2**.

35.     As a result of this intramural dispute, competing Tribal Councils have been formed, which have conducted competing Tribal elections, appointed separate Tribal courts, promulgated conflicting Tribal laws, and issued mutual Tribal disenrollments.

36.     Although several groups claim to constitute the Tribe's governing body, there currently is no federally recognized Tribal government.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

37.     There are at least four groups of Tribal members involved in the intramural Tribal dispute.  At various times, individual factions have formed and broken alliances among each other.

38.     Since it began, the intramural Tribal dispute has escalated and led to actions that threaten public safety, such as stabbing and other physical injuries, the destruction of private property, and intervention by non-Tribal police authorities.  *See* County of Madera Sheriff's Office, Incident Report (Apr. 3, 2012), a true and complete copy of which is attached hereto as **Exhibit 5**; Ian Lovett, "Power Struggle Over Indian Tribe Splinters Into Violence In California," *New York Times* (February 28, 2012), a true and complete copy of which is attached hereto as **Exhibit 6**.

39.     The intramural tribal dispute continues unabated today.

40.     On or around August 8, 2014, a disputing Tribal group took control of the Tribe's Casino for several days, before relinquishing control.  This new attempt caused a stand-off between competing factions.  In addition, on information and belief, Plaintiffs understand that several Casino employees, including Casino management, were removed from Casino operations.  *See* Marc Benjamin and Carmen George, "Chukchansi Tribal Council has another shakeup," *Merced Sun-Star* (August 8, 2014), a true and complete copy of which is attached hereto as **Exhibit 7**.

41.     On or about August 21, 2014, the Madera County Sheriff's Office responded to reports of another attempted takeover of the Tribal properties.  The Sheriff's Office, as well as California Highway Patrol, expended substantial resources to keep the peace during this attempt, establishing a command post at or near the Tribe's Rancheria, patrolling the area, establishing traffic controls on Tribal roads, and monitoring the Tribe's offices.  *See* Gina Clugston, "Tensions Rise at Chukchansi Casino," *Sierra News Online* (Aug. 21, 2014), a true and complete copy of which is attached hereto as **Exhibit 8**.

42.     On or around August 25, 2014, two allied Tribal groups took physical control of the Tribe's Casino.  Another disputing group retained physical control of the Tribe's offices.  *See* Marc Benjamin, "New takeover attempt waged at Chukchansi tribal office," *Fresno Bee* (Aug. 25, 2014), a true and complete copy of which is attached hereto as **Exhibit 9**.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L St., STE 250
SACRAMENTO, CA 95811

43.     Currently, no single faction maintains possession of all of the Tribal properties. Instead, certain disputing Tribal groups possess physical control of the Tribe's Casino, while others possess physical control over the Tribal offices and other Tribal buildings.  Physical confrontations over possession of the various Tribal buildings currently are occurring on a continuing basis.

44.     In particular, Madera County Sheriff John P. Anderson recently stated his belief that that the situation at and around the Rancheria has "created an extreme and immediate danger of a conflict arising with areal potential that violence could occur including armed conflicts."  Declaration of John P. Anderson dated September 19, 2014, at p. 11 ¶ 33, a true and complete copy of which (but without attached exhibits) is attached hereto as **Exhibit 10**.  The Sheriff also noted that "if weapons are fired in disputes over the Tribal Compound, the Casino and its adjacent hotel or [other Tribal buildings], it is possible that bullets could travel to areas occupied by the public, including Casino patrons . . . ."  Anderson Declaration, **Ex. 10**, at p. 10 ¶ 32.  According to the Sheriff, "[t]here is no question that each side is prepared to provoke the other and that all parties are not engaging in increasingly provocative behaviors . . . ."  Anderson Declaration, **Ex. 10**, at p. 10 ¶ 32.

45.     For example, the Sheriff has observed disputing Tribal members have attempted takeovers of the Casino or other Tribal buildings, with various successes, on several occasions between September 8, 2014 and September 19, 2014, and "by whatever means necessary."  *See* Anderson Declaration, **Ex. 10**, at pp. 7-10 ¶¶ 23-31.  In addition, again according to the Madera County Sheriff, a fire was set at or near one of the Tribal buildings on or around September 13-14, 2014.  Anderson Declaration, **Ex. 10**, at p. 8 ¶ 25.

46.     The Sheriff therefore cautioned that the situation "presents an imminent threat to the public health and safety, as well as my deputies trying to keep the peace on a daily basis."  *See* Anderson Declaration, **Ex. 10**, at p. 11 ¶ 33.

### Unlawful Hiatus in Government-to-Government
### Relationship with Picayune Rancheria

47.     The Tribe has repeatedly asked the Department to recognize some person or persons to administer and maintain the United States' government-to-government relationship with Picayune Rancheria on an interim basis to avoid any hiatus therein.  *See, e.g.*, Letter, dated July 23, 2012, from

11

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

Morris Reid to Donald Laverdure, Acting Assistant Secretary—Indian Affairs, a true and complete copy of which is attached hereto as **Exhibit 11**; Memo to Assistant Secretary Kevin Washburn, dated May 6, 2014, a true and complete copy of which is attached hereto as **Exhibit 12**.

48.     Beginning in February 2012, over 120 Tribal members sent individual letters to then Assistant Secretary—Indian Affairs Larry Echo Hawk regarding the intra-Tribal dispute and requesting action by the Department of the Interior.  *See* Letter, dated March 1, 2012, from Steven J. Bloxham to Larry Echo Hawk, then Assistant Secretary—Indian Affairs, a true and complete copy of which is attached hereto as **Exhibit 13**.

49.     In his July 23, 2012 letter to then Acting Assistant Secretary Laverdure, Plaintiff Morris Reid observed that he had previously written to Assistant Secretary Echo Hawk.  Plaintiff Reid observed, however, that "no action was ever taken, and since that time, the situation and dangers facing the Tribal members has significantly worsened."  Reid Letter to Laverdure, **Ex. 11**, at 1.  Plaintiff Reid further informed the Acting Assistant Secretary that a policy had been implemented "to allow certain Tribal members . . . to carry firearms on Tribal lands," creating further danger.     Reid Letter to Laverdure, **Ex. 11**, at 2.  Plaintiff Reid advised the Acting Assistant Secretary that "this dispute will not resolve itself," and therefore "it is imperative that you take immediate action regarding the dispute facing the Tribe."  Reid Letter to Laverdure, **Ex. 11**, at 2-3.

50.     State and Federal agencies also implored the Department to take action to avoid any discontinuity in services to Picayune Rancheria and its members.  *See, e.g.,* Letter from Jacob Applesmith, Senior Advisor to the California State Governor, to Kevin Washburn dated August 5, 2013; Letter from Sandra Henriquez, Assistant Secretary of HUD, to Kevin Washburn dated January 24, 2014; and Letter from Eric Schalansky, Sacramento Region Director of the NIGC, to Department, true and correct copies of which are attached hereto as **Exhibit 14**.

51.     Further, the Madera County Sheriff, John P. Anderson, has expressed difficulty in fulfilling his law enforcement duties due to the lack of an effective decision by the Department recognizing an interim government of the Tribe, which has resulted in litigation.  *See Anderson v. Duran*, No. 13-cv-04825-RS (N.D. Cal. filed Oct. 17, 2013); *see also* Letter from Sheriff John

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

Anderson to Congressman McClintock dated June 12, 2013, a true and complete copy of which is attached hereto as **Exhibit 15**. The litigation in *Anderson v. Duran* itself has in part arisen and been further complicated and prolonged by the lack of action by the Department upon which the parties and the Court can rely.

52.     As of the date of filing this action, the Department has effectively refused to take any action, thereby knowingly creating a hiatus in the United States' government-to-government relationship with Picayune Rancheria since the dispute began that continues to the present.

53.     The Superintendent of the BIA Central California Agency ("Superintendent") was informed of the intramural dispute soon after it arose.

54.     Despite repeated requests to do so, the Superintendent declared that he would make no decision regarding the dispute or deal with any party thereto. *See, e.g.,* Eddie Jiminez, "Bureau of Indian Affairs to stay out of Chukchansi election dispute," *Fresno Bee* (Dec. 28, 2011); Marc Benjamin, "Chukchansi Indians tribal council dispute stalls," *Fresno Bee* (Jan. 13, 2012); Carmen George, "BIA Says Chukchansi People Can 'Work it Out'," *Sierra Star* (Feb. 9, 2012), true and complete copies of which are attached hereto as **Exhibit 16**.

55.     As a result of the Department's refusal even to recognize anyone to administer and maintain the United States' government-to-government relationship, that relationship was suspended and a hiatus created.

56.     After more than a year of standing on the sidelines and observing the dispute, the Superintendent on May 16, 2013 acknowledged one group of disputants as having been elected in December 2012. A true and correct copy of the Superintendent's May 16, 2013 acknowledgment is attached hereto as **Exhibit 17**. The Superintendent's May 16, 2013 Decision was timely appealed and never went into effect.

57.     On February 11, 2014, the BIA Pacific Regional Director (the "Regional Director") issued a decision vacating the Superintendent's actions. Acknowledging the ongoing intramural dispute, the Regional Director identified the 2010 Tribal Council as the governing authority of the Tribe on an interim basis for government-to-government purposes until the Tribe could resolve the

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

matter according to Tribal law. A true and correct copy of the Regional Director's February 11, 2014 letter is attached hereto as **Exhibit 2**.

58.     The Regional Director determined, among other things, that the Tribe's intramural dispute was "controlled by tribal law and f[e]ll within the exclusive jurisdiction of the Tribe"; that "no provision in the Tribe's Constitution or federal law" provided the BIA with authority to determine which disputant's interpretation of Tribal law was correct; and that nothing in the record showed whether the purported elections allegedly resolving the dispute were in fact "conducted in accordance with tribal governing documents." **Ex. 2**, at 6.

59.     The Regional Director found that the situation confronting Picayune Rancheria's enrolled members had "deteriorated" significantly; that the "level of conflict" on the Rancheria from the dispute had risen to "extremely concerning" levels; that reports had been received of attacks on Tribal buildings leading to "threatened violence" and "a stabbing," and intervention by the Madera County Sheriff's Department. **Ex. 2**, at 6.

60.     The Regional Director found that the dispute had created "multiple financial hardships" for the Tribe and its members, including "reported defaults on loans connected with the Tribe's gaming facility." She found that "many" Federal agencies could no longer determine "whom to conduct business with amidst the dispute," which caused "essential Tribal programs that are funded by the Federal government" to cease operation, including federal housing programs for Tribal members. **Ex. 2**, at 7.

61.     Critically, the Regional Director acknowledged that a hiatus then existed in the United States' government-to-government relation with the Tribe. To prevent any "further hiatus," as well as continuing harms therefrom, the Regional Director deemed that thenceforward the Department would "conduct business, on an interim basis," with "the last uncontested Tribal Council elected in December 2010." **Ex. 2**, at 6.

62.     The last uncontested Tribal Council elected in 2010 was comprised of seven Tribal members representing the various competing sides of the current intramural dispute. It is undisputed

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

1   that Individual Plaintiffs Morris Reid and Dora Jones are members of the last uncontested Tribal

2   Council. **Ex. 2**, at 6.

3       63.     The Regional Director found the "increasing issues" detailed in her decision to be

4   grounds for finding it would be in the public interest to put her decision into immediate effect. **Ex. 2**,

5   at 7.

6       64.     The Regional Director's decision was timely appealed to the Interior Board of Indian

7   Appeals ("IBIA") pursuant to the Department's regulations, where it is currently pending. 25 C.F.R.

8   § 2.4(e); 43 C.F.R. § 4.331. In the interim, however, the IBIA denied the Regional Director's request

9   to make her decision effective immediately pending the appeal. A true and complete copy of the

10  IBIA's April 15, 2014 Order Denying Motion to Place Regional Director's Decision into Immediate

11  Effect is attached hereto as **Exhibit 18**.

12      65.     On July 1, 2014, the clerk of the IBIA informed Plaintiffs' attorneys that no action had

13  been taken on the appeal of the Regional Director's decision and that no action was likely before

14  several months, based on the IBIA's current case load. *See* **Exhibit 19**, Declaration of Suzanne

15  Balluff, ¶ 4-5.

16      66.     Plaintiffs made several requests, both in writing and in person, to the ASIA's office to

17  exercise the ASIA's authority under the Department's rules and regulations to render the Regional

18  Director's decision effective pending its appeal or to otherwise recognize an interim Tribal

19  government during the interim intramural dispute and appeal period. 25 C.F.R. § 2.20(c); 43 C.F.R.

20  §§ 4.5; 4.332(b). The ASIA refused, and as a result the Regional Director's decision remains

21  ineffective, the United States continues not to engage in a government-to-government relationship

22  with Picayune Rancheria, and Tribal members and the public at large continue to suffer.

23                                                          **Impact of Hiatus**

**on Tribal Members**

24      67.     The hiatus created by the Department has now lasted over two-and-a-half years.

25      68.     The hiatus has resulted in the termination of Federal housing programs providing

26  services to low-income Tribal members, among other things.

27

28

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**         **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

69.     The U.S. Department of Housing and Urban Development Southwest Office of Native American Programs ("HUD") provides annual block grants to Picayune Rancheria through the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. § 4101 et seq.

70.     The NAHASDA block grants are used to provide affordable housing to low-income Tribal members.

71.     The NAHASDA block grants are administered by the Chukchansi Indian Housing Authority ("CIHA"), a not-for-profit entity established by Tribal ordinance and governed by a board of commissioners appointed by the Tribal Council.  NAHASDA requires that HUD pay the block grants "directly to the recipient for the Tribe." 25 U.S.C. § 4111(a)(2).

72.     The persons authorized to receive NAHASDA block grant funds are provided with access to an automated Line of Credit Control System ("LOCCS") for the purpose of accessing and withdrawing the funds.

73.     When competing groups to the Tribe's intramural dispute each contacted HUD in 2013 claiming to be the Tribe's duly elected government, HUD asked the BIA to identify who the Department recognized for purposes of conducting the United States' government-to-government relationship with the Tribe.

74.     When BIA officials told HUD that the Department had made no final determination on who to treat as the Tribe's recognized government, HUD shut down the Tribe's LOCCS system to prevent anyone from accessing any NAHASDA block grant funds.  A true and correct copy of HUD's notice letter, dated August 22, 2013, is attached hereto as **Exhibit 20**. HUD also revoked all prior approvals of any forms that had been submitted on behalf of the Chukchansi Indian Housing Authority. *Id*.

75.     HUD officials stated they would lock access to the LOCCS system until HUD received confirmation as to which persons purporting to act on behalf of the Chukchansi Indian Housing Authority were in fact authorized and designated by a federally-recognized tribal government to do so. **Ex. 20**.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**              **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

76.     Picayune Rancheria currently has at least $2,956,212.00 in funds frozen in its LOCCS system.

77.     In addition, HUD refused to award the Tribe an Indian Housing Block Grant for the 2014 fiscal year, resulting in the Tribe's loss of ***more than $1 million*** in Indian Housing Block Grant funds.  A true and correct copy of HUD's notice letter, dated January 17, 2014, is attached hereto as **Exhibit 21**.

78.     HUD's freezing of Picayune Rancheria's NAHASDA block grant funding and refusal to award a new Indian Housing Block Grant both are a direct result of the hiatus created by Defendants.

79.     The freeze on the Tribe's federal housing grant funds has caused hardships for Tribal members most in need. Tribal members facing utility shut-offs, for example, cannot receive immediate assistance. Homeless Tribal members have nowhere to turn for assistance in moving into new homes. Tribal members facing eviction are without emergency financial aid. And it means that the long-standing employees of the tribal housing authority cannot be paid.

80.     The Tribe's housing authority cannot pay its outstanding bills or employees, and due to the current freeze caused by the hiatus, is prevented from providing emergency assistance to Tribal members facing a cut-off of utilities, from providing move-in assistance for homeless Tribal members, and from preventing Tribal members from being evicted.

**Impact of Hiatus**
**on ISDEAA Programs**

81.     The hiatus has disrupted both the availability and the provision of services contracted for with the Federal government under the Indian Self-Determination and Education Assistance Act ("ISDEAA").

82.     Department officials have repeatedly rejected ISDEAA contract renewal applications since the intramural dispute began on the basis that none come from a federally-recognized tribal government. *See, e.g.*, Letters from Superintendent Troy Burdick dated May 5, 2014 and Sept. 4, 2013, true and correct copies of which are attached hereto as **Exhibit 22**, and Letter from Troy Burdick dated May 16, 2013, **Ex. 17**.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

83.     The Department's continuing refusal to accept any application to renew tribal ISDEAA agreements threatens imminent and irreversible harm to a broad segment of Tribal membership.

84.     Because the Department itself is responsible for refusing to recognize anyone on an interim basis to administer and maintain the United States' government-to-government relationship with Picayune Rancheria, its refusals to accept any ISDEAA applications on that basis is facially arbitrary and capricious.

85.     The hiatus has put federal funds at risk that are used to pay for college scholarship programs for Picayune Rancheria tribal members. For example, federal funds totaling about $120,000 are made available annually through an ISDEAA contract to provide college scholarships to adult members of Picayune Rancheria in financial need seeking bachelors, associates, or vocational educational degrees. If the Department continues to refuse to accept any ISDEAA renewal application for this program, Picayune Rancheria members most in need will lose a significant source of funding for vocational and higher education.

86.     The hiatus has put federal funds at risk that are used to pay for tutoring programs for Indian children. For example, ISDEAA contracts provide funding for a program that provides tutoring for approximately thirty-five Indian children aged between 3 and 12. The program offers on-reservation learning assistance in language arts, math, social studies, and science, and it is available to Indian children who live in the vicinity of Picayune Rancheria. If the Department continues to refuse to accept any ISDEAA renewal application for this program, Indian children living on and near the reservation will be forced to go without any tutoring in basic educational disciplines.

87.     The hiatus has put federal funds at risk that are used to pay for fire safety programs intended to protect and assist vulnerable Tribal members. For example, an ISDEAA contract provides annual funding for Picayune Rancheria's Community Fire Protection program, the goal of which is to reduce the spread of fire around homes belonging to low-income Tribal members and to disabled Tribal elders living on Indian allotments within the Tribe's service area.  If the Department continues to refuse to accept any ISDEAA renewal application for this program, some of these Tribal members

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

1  will be placed at increased risk of harm from wildfires. *See* Carmen George, "Federal relief sought

2  for Oakhurst fire," *Fresno Bee* (Aug. 21, 2014), a true and complete copy of which is attached hereto

3  as **Exhibit 23.**

4     88.    The hiatus has put federal funds at risk that are used to pay for programs to enhance

5  and protect natural resources and Tribal heritage. For example, an ISDEAA contract provides annual

6  funding for a fisheries, wildlife and recreation program. This program develops projects to enhance

7  Native American culture on the Tribe's trust land. The project also works to identify and protect

8  natural resources on a Tribe's trust lands and provides education to Tribal members about the Tribe's

9  cultural heritage. If the Department continues to refuse to accept any ISDEAA renewal application

10 for this program, the ability to protect the natural resources and cultural heritage of the Picayune

11 Rancheria will be greatly diminished.

12    89.    The hiatus has led to the termination of other services to Picayune Rancheria

13 members, including the Individual Plaintiffs. The terminated services include the loss of per capita

14 payments under the Tribe's federally-approved gaming revenue allocation plan adopted pursuant to

15 IGRA; child care services; "back-to-school" resources for enrolled members' children such as

16 clothing allowances, backpacks, and gift cards for school use; financial assistance for Tribal members

17 college students; grocery aid for Tribal Elders; assistance for utility bills; and housing services.

18    90.    As a direct result of the hiatus in the United States' government-to-government

19 relationship with Picayune Rancheria, the Tribe is unable to make its annual donation of $1 million

20 dollars to Madera County, which is used by the County to support the costs of schools, animal

21 welfare agencies, and churches and veterans groups in the County.

22

23                          **Impact of Hiatus**
                          **on Tribal-State Compact**

24    91.    Sixty-one California Indian tribes are parties to Tribal-State gaming compacts with the

25 State of California that were entered in 1999 and are set to expire on December 31, 2020 ("1999

26 Compacts"). The Picayune Rancheria is a party to a 1999 Compact.

27

28

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

92.     A coalition consisting of California Indian tribes with 1999 Compacts has requested that the State of California enter into negotiations to either extend the 1999 Tribal-State compacts or, alternatively, negotiate and enter new Tribal-State compacts to become effective on January 1, 2021. The Picayune Rancheria is participating in meetings of the 1999 Compact Gaming Tribe Coalition.

93.     However, because of the intramural Tribal dispute, the State of California has declined to enter negotiations with the Picayune Rancheria at this time, stating that a "request to negotiate can only come from, and negotiations can only be conducted by, the duly elected and [federally] recognized Chairperson of the Picayune Rancheria of the Chukchansi Indians."   Accordingly, because the Department has not recognized any officials for government-to-government purposes, the Office of the California Governor concluded that it "cannot accept the Tribe's request to enter negotiations at this time."   A true and complete copy of the letter from Joginder Dhillon, Senior Advisor to the California Governor for Tribal Negotiations, dated May 9, 2014, is attached hereto as **Exhibit 24**.

**Unlawful Gaming
on Indian Lands**

94.     By virtue of its government-to-government relationship with the United States, the Picayune Rancheria is eligible to conduct class II and class III gaming on the trust lands over which it exercises jurisdiction and governmental authority pursuant to IGRA.

95.     The Picayune Rancheria owns a destination resort and casino located on its Reservation and known as the Chukchansi Gold Resort and Casino (the "Casino").

96.     The Casino is located on Indian lands of the Tribe and offers class II and class III gaming under federal and tribal law, and pursuant to a Tribal-State gaming compact entered into with the State of California.

97.     The distribution of revenues from class II and class III gaming is governed by IGRA.

98.     IGRA requires gaming revenues be distributed in accordance with a federally-approved revenue allocation plan.  25 U.S.C. § 2710(b)(3) & (d)(1); 25 C.F.R. Part 290. The Tribe's

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

current revenue allocation plan was approved by the Department pursuant to IGRA in 2007. A copy of the Tribe's current revenue allocation plan is attached hereto as **Exhibit 25**.

99.     In 2011, the Casino reported in excess of $100 million in gross revenues.

100.     One million dollars ($1,000,000.00) per month is paid by the Casino to the Tribe pursuant to the Tribe's revenue allocation plan. Of this amount, 32.5% is to be distributed "once a month in equal proportion to all eligible Tribal members" and 45% is to be distributed to Tribal Government for use in providing services "to Tribal members at the direction of the Tribal Council." **Ex. 25**. The remainder is to be allocated between the Tribe's economic development fund, which is "earmarked for projects to diversify the Tribe's income," and its permanent fund, a "restricted, long term fund that is invested in assets" the interest from which "is distributed annually to Tribal members." *Id*.

101.     Class III gaming activities at Picayune Rancheria's Casino are governed by a federally-approved Tribal gaming ordinance that is in effect (the "Picayune Gaming Ordinance" or the "Gaming Ordinance"), IGRA and its implementing regulations, and a federally-approved compact between Picayune Rancheria and the State of California that is in effect (the "Picayune Compact" or the "Compact"). 65 Fed. Reg. 31,189 (May 16, 2000).  A copy of the Gaming Ordinance, dated April 16, 2010, and the Compact are attached hereto as **Exhibits 26 and 27**, respectively.

102.     The Picayune Compact prohibits conducting class III gaming activities at the Casino in a manner that endangers the public health, safety, or welfare (Compact §§ 10.1; 6.4.2(b)); that Class III gaming activities comply, at a minimum, with an NIGC-approved tribal gaming ordinance (Compact § 6.1); and that all class III gaming operations be solely owned by the Tribe. Compact § 6.2.

103.     Under the Picayune Compact, all persons "in any way connected" with the Tribe's gaming operations or facilities who are required to be licensed must be licensed by Picayune Rancheria through its Tribal Gaming authority. Compact § 6.4.1.

104.     The Compact and the Gaming Ordinance require that every employee, key employee, management official, gaming enterprise and gaming facility that aids, participates in or is related to

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**           **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

gaming must have "a current and valid License" issued by the Tribal Gaming Commission. Compact § 6.4.4(a); Gaming Ord. § 5.1.1.

105.    The Compact and the Picayune Gaming Ordinance require that any license issued pursuant to the Tribal Gaming Ordinance shall expire after two years from the date of issuance. Compact § 6.4.2(a); Gaming Ord. § 5.8.1.

106.    The Compact mandates that all gaming activities at the Casino comply with the Picayune Gaming Ordinance and with the duly adopted rules, regulations, procedures, specifications, and standards of the Tribal gaming authority. Compact § 6.1.

107.    The Gaming Ordinance expresses that gaming must be "regulated and controlled by the Tribe pursuant to the Compact authorized by the IGRA, and that the Net Revenues received by the Tribe from Gaming are used exclusively for the benefit of the Tribe." Gaming Ord. § 1.3.2.

108.    Among other things, the Gaming Ordinance requires Picayune Rancheria to "have sole proprietary interest in and responsibility for the conduct of Gaming Facilities and/or Enterprises authorized by this Ordinance" (Gaming Ord. § 1.3.3); deems it "essential" that the Tribal Council regulate class II and class III gaming "in a manner commensurate with applicable Federal, State and Tribal law and policy" (Gaming Ord., § 1.1.3); and defines "Tribal Council" as meaning "the duly elected Tribal Council of the Tribe" (Gaming Ord. § 2.67).

109.    The Gaming Ordinance establishes a Gaming Commission as a political and governmental subdivision of the Tribe whose purpose is to enforce IGRA, the Compact, and the Gaming Ordinance. Gaming Ord. §§ 4.1; 4.5; 4.18.1. The Gaming Ordinance requires the Tribal Council to appoint its chairperson annually in February and to meet with the Gaming Commission monthly (Gaming Ord. §§ 4.11.3, 4.13.3) and to approve the Commission's budget annually. Gaming Ord. §§ 4.10.2(4); 4.20.

110.    The Gaming Commission is required to provide a report to the Tribal Council monthly and to keep the Tribe's government fully informed as to the status of the Gaming Commission's activities. Gaming Ord. § 4.25. Its responsibilities include "work[ing] directly, _and only_" with the

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

Tribal Council "with regard to any Gaming issues, including policy issues arising at or with the State and Federal government." Gaming Ord. § 4.18.5 (emphasis added).

111.    The Tribe's Gaming Ordinance gives the Gaming Commission jurisdiction over all violations of the Gaming Ordinance except as otherwise provided. Gaming Ord. § 8.1.

112.    The Tribe's Casino has operated continuously since the hiatus in the government-to-government relationship began.

113.    The continuing operation of the Casino during the hiatus poses a threat to public safety.  During the hiatus, the Casino has been the site of physical confrontations and violent assaults between contending parties to the intramural dispute. Control of the Casino premises and its class II and class III gaming operations has been assumed by different groups at different times, each purporting to act under color of federal and Tribal law and some supported by private armed security.

114.    Picayune Rancheria has had no federally-recognized Tribal government since on or about December 2011.

115.    The terms of office of all seats on the Tribe's Gaming Commission have expired by operation of the Tribe's Gaming Ordinance. Without a federally-recognized tribal government, members of the Gaming Commission whose terms have expired cannot be appointed or replaced and the Gaming Commission cannot fulfill its responsibilities under federal and Tribal law to supervise Casino operations.   Without a federally-recognized Tribal government, annual funding for the Commission cannot lawfully be authorized.

116.    IGRA and the Compact prohibit anyone other than a federally-recognized tribal government through its federally-recognized officials from conducting class II and class III gaming on a tribe's Indian lands. *See* NIGC, *In the Matter of Sac and Fox Tribe of the Mississippi in Iowa* ("*NIGC Sac & Fox I*"), Docket No. NIGC 2003-1, at 15 (Sept. 10, 2003) (quoting NIGC Tuscarora Decision Letter), a copy of which is attached hereto as **Exhibit 28**.

117.    The hiatus in the United States' government-to-government relationship with Picayune Rancheria means there is currently no federally-recognized Tribal government to lawfully authorize or conduct class II or class III gaming on the Tribe's Indian lands.  As a result, any gaming conducted

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

on the Rancheria is "is not Indian gaming under the IGRA."  See, *NIGC Sac & Fox I*, at 16, **Ex. 28**.  Thus, such gaming is, by definition, unregulated and in violation of law.

118.    Further, the unregulated operation of the gaming facility has allowed various disputants to abuse the Tribe's Casino and its resources for political and other leverage in the intramural dispute.  In this way, the continuation of unregulated gaming corrupts the sovereign governance of the Tribe.

119.    For example, various groups have taken physical control of the Casino, barricaded themselves on the "11th floor," and purported to operate the government from behind the protection of the Casino's security and utilizing cash taken directly from the Casino "cage" for political purposes.  In fact, this is the impetus of the frequent attempts by various groups to "take over" the Tribe's Casino and can lead to physical confrontations and violence.  *See, e.g.*, "Attorney General Sues to Halt Armed Inter-Tribal Warfare over Northern California Casino," *All Gov California* (July 23, 2014), and Stephen Magagnini, "Northern California tribe splits into armed camps over casino profits," *Sacramento Bee* (June 15, 2014), true and complete copies of which is attached hereto as **Exhibit 29**.

120.    In addition, purported members of the Tribal Gaming Commission, utilizing the weight of the Casino resources, have interfered in matters of Tribal governance during the dispute.

121.    For these and other reasons, unregulated Indian gaming is against the public interest and presents "a threat to public safety." See, *NIGC Sac & Fox I*, at 3, **Ex. 28**.

**NIGC Abdication
of Responsibilities**

122.    The NIGC and its officials know and have known that there has been no federally-recognized Tribal government as the result of and during the hiatus.

123.    The NIGC and its officials know that class II and class III gaming operations continue unabated at the Casino today, notwithstanding the hiatus or the threats to public safety created by such unregulated gaming.

124.    The NIGC has been informed repeatedly that class II and class III gaming is being conducted at the Casino in an unlawful manner.  *See, e.g.*, Email from Steven J. Bloxham to Maria

24

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

Getoff, Senior Attorney for the NIGC, a true and complete copy of which is attached hereto as **Exhibit 30** (stating that, in the absence of an effective recognition of a Tribal government by the Department, "it follows that NIGC is confronted with and needs to address the fact that illegal gaming is occurring."). In particular, the NIGC has been made aware of direct and flagrant violations of IGRA. *See, e.g.*, letter dated May 23, 2014 to Eric Shepard, Acting General Counsel, NIGC, a true and complete copy of which is attached hereto as **Exhibit 31**; letter from NIGC dated April 1, 2014 (describing missing audits), a true and complete copy of which is attached hereto as **Exhibit 32**.

125. These violations include the improper handling and distribution of cash proceeds from class II and class III gaming at the Casino and the diversion of funds from per capita distributions pursuant to the Tribe's NIGC-approved revenue allocation plan. *See* Affidavit of Jesus Castillo dated June 4, 2014, a true and complete copy of which is attached hereto as **Exhibit 33**; Affidavit of Michelle Avila dated June 4, 2014, a true and complete copy of which is attached hereto as **Exhibit 34**.

126. The NIGC is also aware that various Tribal disputants have occupied the Casino and abused Casino resources for purposes related to the intramural Tribal dispute. *See* Letter, dated March 23, 2012 from Morris Reid to Tracie Stevens, then-Chair of the NIGC, regarding abuses of Casino resources and resulting Gaming Ordinance amendments, a true and complete copy of which is attached hereto as **Exhibit 35**.

127. The NIGC is also aware that purported members of the Tribal Gaming Commission have interfered in the Tribal political dispute. Letter, dated August 21, 2012, from Mark Emerick to Tracie Stevens, a true and complete copy of which is attached hereto as **Exhibit 36**.

128. The NIGC is aware that for the last two-and-a-half years, the Casino's class II and class III gaming operations have been conducted by persons who are not a federally-recognized tribal government or its federally-recognized officials.

129. Since the hiatus began in December 2011, the NIGC has taken no enforcement action despite its awareness of unlawful activities and unregulated gaming at the Casino.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

130.    The NIGC further has refused to prevent the abuse of the Casino and its resources for political purposes concerning the intramural Tribal dispute.

131.    The NIGC and its Chairman have abdicated their responsibilities under IGRA in violation of federal law.

**California Abdication
of Responsibilities**

132.    Pursuant to IGRA, class III gaming activities may only occur on Indian lands only if such activities are pursuant and in conformance with a Tribal-State compact entered into by the Indian tribe and the State.  25 U.S.C. § 2710(d)(1).

133.    IGRA requires that a State negotiate in good faith to enter into such gaming compact upon a request by an Indian tribe.  25 U.S.C. § 2710(d)(3).

134.    IGRA further confers to the State the authority to enforce a gaming compact by, *inter alia*, filing an action to enjoin class III gaming activities conducted in violation of the Tribal-State compact.  25 U.S.C. § 2710(d)(7)(A)(iii).

135.    By virtue of entering into a gaming compact with an Indian tribe, the State has a duty, pursuant to IGRA, to enforce the gaming compact.

136.    California has a "legitimate sovereign interest in regulating the growth of Class III gaming activities in California."  Tribal-State Compact Between the State of California and the Chukchansi Indians ("Gaming Compact"), at 2, a true and complete copy of which is attached hereto as **Exhibit 27**.  The Picayune Rancheria "and the State share a joint sovereign interest in ensuring that tribal gaming activities are free from criminal and other undesirable elements."  Gaming Compact (**Exhibit 27**), at 3.

137.    Pursuant to the above interests and the provisions of IGRA, California and the Tribe entered into a Tribal-State gaming compact in or around September 1999.

138.    Pursuant to the Gaming Compact, "*[t]he Tribe* is hereby authorized and permitted to operate . . . Gaming Activities under the terms and conditions set forth in this Gaming Compact." Gaming Compact (**Exhibit 27**), at § 2.13 (emphasis added).

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

139.   Further, "[t]he Gaming Operations authorized under this Gaming Compact shall be owned solely by the Tribe."  Gaming Compact (**Exhibit 27**), at § 6.2.

140.   Pursuant to the Gaming Compact, the "Tribe will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare."  Gaming Compact (**Exhibit 27**), at § 10.1.

141.   "It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Gaming Compact, IGRA, and the Tribal Gaming Ordinance . . . and to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and the confidence of patrons that tribal government gaming in California meets the highest standards of regulation and internal controls." Gaming Compact (**Exhibit 27**), at § 7.1.

142.   If the Tribe or the Tribal Gaming Agency requests the assistance of the State in enforcing the Gaming Compact, IGRA, the Tribe's Gaming Ordinance, or in ensuring the integrity of the Gaming Activities, "the State shall provide requested services to ensure proper compliance with this Gaming Compact."  Gaming Compact (**Exhibit 27**), at § 7.3.

143.   As California itself acknowledges, "[w]hile the Tribe maintains the primary responsibility for on-site regulation of gaming operations, the State is ultimately responsible for ensuring compliance with all aspects of the compact."  Office of the Attorney General, "Bureau of Gambling Control," a true and complete copy of which is attached hereto as **Exhibit 37** and available at http://oag.ca.gov/gambling.

144.   As explained above, gaming activities conducted by any entity or individuals other than the federally-recognized tribal government, or its designates, is, by definition, unregulated and in violation of IGRA and the Tribal-State gaming compact.

145.   Further, as explained above, unregulated Indian gaming presents "a threat to public safety." See, *NIGC Sac & Fox I*, at 3, **Ex. 28**.

146.   In fact, lack of enforcement of the Picayune Compact in the face of the Casino's operation by unrecognized officials has resulted in public disorder and physical violence against

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

Tribal members, including Individual Plaintiffs. *See* Ian Lovett, "Power Struggle Over Indian Tribe Splinters Into Violence In California," *New York Times* (February 28, 2012), **Ex. 6**.

147.    The Attorney General, the CGCC, the CGCC Executive Director, the BGC, and the BGC Chief have the authority and the responsibility to take enforcement against any unlawful gaming activities occurring on the Tribe's Indian lands conducted in violation of the Gaming Compact.

148.    California, as well as the Attorney General, the CGCC, and the BGC, is aware that for the last two-and-a-half years, the Casino's class II and class III gaming operations have been conducted by persons who are not a federally-recognized tribal government or its federally-recognized officials and in violation of the Gaming Compact.

149.    In addition, California, as well as the Attorney General, the CGCC, and the BGC, is aware that disputes over the control of the Tribe's Casino have led to public disorder, including violence against Tribal members.

150.    California, as well as the Attorney General, the CGCC, and the BGC, is aware that aware that members of various Tribal groups have physically occupied the Tribe's Casino in order to gain leverage, cash, and other resources in the Tribal political dispute.

151.    In fact, the Madera County Sheriff, who legally is under the direct supervision of the Attorney General, has allowed various unrecognized individuals and groups to take possession of and occupy the Tribe's Casino. *See* Cal. Const. Art. 5, § 13 ("The Attorney General shall have direct supervision over every . . . sheriff . . . in all matters pertaining to the duties of their respective offices.").

152.    For example, Plaintiff Morris Reid sent a letter, dated August 20, 2012, to the Attorney General informing her of the Madera County Sheriff's failure to protect Tribal members from violence stemming from Casino activities. *See* Letter, dated August 20, 2012, from Morris Reid to Kamala Harris, a true and complete copy of which is attached hereto, without exhibits, as **Exhibit 38**.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L St., STE 250
SACRAMENTO, CA 95811

153.    Since the Casino began being operated by an entity other than the federally-recognized Tribal government in December 2011, California and its officials have taken no action to enforce the Gaming Compact.

154.    California and its officials and agencies have abdicated their responsibilities under IGRA in violation of federal law.

## FIRST CLAIM FOR RELIEF

### DOI – APA Violation
### (Unlawful Hiatus in United States' Relationship to Tribe)

155.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 154 of this Complaint.

156.    The United States is required to administer and maintain a distinct government-to-government relationship with every federally-recognized Indian tribe.

157.    The Secretary is required to administer and maintain the government-to-government relationship even during a protracted intramural tribal dispute.

158.    The Department and its officials have acknowledged creating a hiatus resulting in the suspension of the United States' government-to-government relationship with Picayune Rancheria.

159.    The hiatus is an arbitrary and capricious sanction against the Picayune Rancheria.

160.    The hiatus has caused harm to Tribal members and to the interests of the Tribe in violation of the United States' legal obligations to Picayune Rancheria.

161.    As a result of the hiatus, other federal agencies, including but not limited to HUD and the NIGC, lack any authorized point of contact with whom to continue to provide essential federal services and oversight.

162.    As a result of the hiatus, the NIGC refuses to act to prevent unlawful gaming occurring at the Tribe's Casino on the basis that only the Department can determine what persons constitute Picayune Rancheria's federally-recognized government.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

163.    As a result of the hiatus, the Tribe and its members have suffered harms and the general public has been put at risk given, among other factors, the unregulated class II and class III gaming at the Tribe's Casino.

164.    The Department and its officials have refused to take action to correct the hiatus in violation of their responsibilities under federal law.

165.    The Department's and its officials' refusal to take action constitutes agency action unlawfully withheld or unreasonably delayed.

166.    When public exigency and undue delay over a significant period of time exist as they do here, the Department violates its duty to maintain a proper government-to-government relationship with this federally-recognized Tribe, at least on an interim basis.    Further, failure to act constitutes agency action for purposes of review pursuant to the APA.  In this case, the Department's failure to recognize any person or persons to administer and maintain the Tribal-Federal relationship on an interim basis marks the consummation of the Department's decision-making process, whereby rights or obligations have been determined, and the decision is one from which legal consequences will flow.  Accordingly, the Department's actions and/or failure to act constitute final agency action.

167.    The hiatus in and suspension of the United States' government-to-government relationship with Picayune Rancheria is likely to continue for the foreseeable future and may cause irreparable harm to the Tribe and its members.

168.    Given the increasing risks noted by the Regional Director and by other federal officials, the administration and maintenance of the United States' government-to-government relationship with Picayune Rancheria on an interim basis is now a matter of public exigency.

169.    The Secretary's obligation to recognize officials on an interim basis to end the hiatus and restore the United States' government-to-government relationship with Picayune Rancheria is not relieved or otherwise delayed either by a delegation of responsibility by the Secretary or during the pendency of Departmental decision-making procedures, including internal appeals.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

170.    The Secretary "retains the power to waive or make exceptions to his regulations as found in in chapter I of title 25 C.F.R. in all cases where permitted by law and the Secretary finds that such waiver or exception is in the best interest of Indians." 25 C.F.R. § 1.2.

171.    The Assistant Secretary—Indian Affairs is authorized to take jurisdiction over matters concerning an Indian tribe's governance, including matters under appeal before the Interior Board of Indian Affairs. *See* 25 C.F.R. § 2.4(c).  Decisions of the AS-IA are final for the Department and effective immediately.  25 C.F.R. §§ 2.20, 2.6(c).

172.    The hiatus is contrary to the United States' obligations under federal law and contrary to the Secretary's own established policies and procedures.

173.    The Department's refusal to end the hiatus is arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with the law; is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and was without observance of procedure required by law.

174.    The Secretary's failure to effectively recognize officials to administer and maintain the Tribal-Federal relationship on an interim basis marks the "consummation" of the Department's agency's decision-making process, whereby "rights or obligations have been determined," and the decision is one from which "legal consequences will flow," and they therefore constitute final agency action.

175.    There is no other adequate remedy in a court and Plaintiffs have exhausted all appropriate administrative remedies, and therefore it is reviewable in accordance with 5 U.S.C. §§ 704 and 706.

176.    Plaintiffs have suffered legal wrong and have been adversely affected as a result of Defendants' failure to recognize any person or persons to administer and maintain the Tribal-Federal relationship on an interim basis.

177.    The relief requested in this First Claim for Relief also is necessary and appropriate in aid of the jurisdiction of this honorable Court and is agreeable to usages and principles of law, within the meaning of 28 U.S.C. § 1651.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

## SECOND CLAIM FOR RELIEF

### NIGC and California Defendants - Declaratory Relief
### (Gaming By Persons Other Than The
### Federally-Recognized Tribal
### Government Is Unlawful Per Se)

178.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 177 of this Complaint.

179.    Class II and class III gaming operations at the Tribe's Casino are governed by the Indian Gaming Regulatory Act ("IGRA"). 25 U.S.C. §§ 2701, *et seq*.

180.    Congress adopted IGRA in 1988 to provide a statutory basis for the regulation of tribal gaming adequate to shield it from organized crime and other corrupting influences, as well as to ensure that the tribe is the primary beneficiary of gaming operations. 25 U.S.C. § 2702(2).

181.    IGRA prohibits class II or class III gaming on Indian lands by anyone other than an Indian tribe or by persons authorized by an Indian tribe through its federally-recognized tribal government. 25 U.S.C. § 2710.

182.    IGRA provides, among other things, that a tribe shall have the sole proprietary interest and responsibility for the conduct of any class II gaming on its Indian lands. 25 U.S.C. § 2710(b)(2)(A).

183.    It is unlawful under IGRA for anyone other than a federally-recognized tribal government or persons authorized thereby to conduct class II or class III gaming on Indian lands.

184.    The Department has refused to recognize any tribal government at Picayune Rancheria on even an interim basis since on or about December 2011, creating a hiatus in the United States' government-to-government relation with the Tribe.

185.    The absence of a federally-recognized tribal government at Picayune Rancheria renders any and all class II or class III gaming operations now occurring at the Casino unlawful *per se*.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

186.    As a result of the unlawful activities, Plaintiffs have been deprived of millions of dollars to which they are entitled under Picayune Rancheria's federally-approved revenue allocation plan.

187.    Plaintiffs are entitled to a declaratory judgment that the class II or class III gaming operations at the Tribe's Casino conducted on the Tribe's Indian lands in the absence of a federally-recognized Tribal government are presumptively unlawful under IGRA.

188.    Plaintiffs are entitled to judgment as a matter of law.

## THIRD CLAIM FOR RELIEF

### NIGC – APA Violation
### (NIGC Abdication of Responsibilities)

189.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 188 of this Complaint.

190.    Congress through IGRA established the NIGC as an independent Federal regulatory authority. 25 U.S.C. § 2702(3).

191.    Congress declared that establishment of the NIGC was necessary to meet congressional concerns and to protect Indian gaming as a means of generating tribal revenue. 25 U.S.C. § 2702(3).

192.    Congress, through IGRA, charged the NIGC with responsibility for a range of supervisory and regulatory functions over Indian gaming, including monitoring class II gaming conducted on Indian lands on a continuing basis; inspecting and examining all premises located on Indian lands where class II gaming is conducted; examining and auditing records respecting gross revenues of class II gaming on Indian lands "and any other matters necessary to carry out the duties of the Commission" under IGRA, among other things. 25 U.S.C. § 2706(b).

193.    The NIGC Chairman has the power to issue orders of temporary closure of gaming activities conducted in violation of IGRA; to levy and collect civil fines; and to approve tribal gaming ordinances, among other things. 25 U.S.C. §§ 2705(a); 2713(b).

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

194.   The NIGC has a duty to prohibit and otherwise prevent gaming by persons who are not federally-recognized as a tribal government or its authorized designees.

195.   The NIGC is aware that a hiatus has existed in the United States' government-to-government relationship with Picayune Rancheria and that the Tribe has been without a federally-recognized Tribal government for even interim purposes.

196.   The NIGC is aware that the Tribe's Casino has been operating since creation of the hiatus without a federally-recognized tribal government, without a federally-recognized court system or other form of administrative process for resolving disputes of any kind, and that the terms of all members of the Tribe's Gaming Commission have since expired under the Tribe's Gaming Ordinance and, without a federally-recognized tribal government, cannot be replaced.

197.   The NIGC is aware that in the absence of a federally-recognized tribal government, the class II and class III gaming operations now going on at the Casino are in violation of IGRA, the Gaming Compact and the Tribe's Gaming Ordinance.

198.   The NIGC's duties under IGRA exist independently of the authority or responsibility of the Secretary of the Interior or her delegees.

199.   IGRA requires the NIGC and its Chairman to take enforcement action to prevent unlawful class II and class III gaming operations at the Casino until the Department recognizes some Tribal governing authority.

200.   To date, the NIGC has taken no steps to halt the unlawful gaming activities now taking place at the Tribe's Casino, despite repeated requests by Plaintiffs to do so.

201.   Through its inaction, the NIGC has abdicated its responsibilities under IGRA.

202.   The NIGC's abdication of its responsibilities under IGRA constitutes agency action unlawfully withheld or unreasonably delayed.

203.   The NIGC's abdication of its responsibilities has deprived the Tribe of its sole proprietary interest in and responsibility for gaming operations at the Casino; has deprived the individual Plaintiffs of their ability to protect their rights and defend their interests under the Tribe's

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**                    **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

federally-approved revenue allocation plan; and constitutes an abdication of the NIGC's responsibilities under federal law.

204.    The NIGC's abdication of its responsibilities has irreparably harmed the Plaintiffs, including loss of Tribal revenues and harm to the Tribe's business reputation.

205.    The NIGC's abdication of its responsibilities does not implicate agency expertise since in the absence of an interim federally-recognized Tribal authority, any class II or class III gaming operations at the Picayune Rancheria Casino are unlawful *per se*.

206.    The NIGC's abdication of its responsibilities is arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with the law; is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and was without observance of procedure required by law.

207.    Plaintiffs have suffered harm as result of the NIGC's abdication of responsibility, including loss of distributions pursuant to the Tribe's federally-approved revenue allocation plan.

208.    The NIGC's abdication of responsibility is final agency action for which there is no other adequate remedy in a court, reviewable in accordance with 5 U.S.C. §§ 704 and 706, and Plaintiffs have exhausted all appropriate administrative remedies.

209.    The relief requested in this claim is necessary and appropriate in aid of the jurisdiction of this honorable Court and is agreeable to usages and principles of law, within the meaning of 28 U.S.C. § 1651.

## FOURTH CLAIM FOR RELIEF

**California Governor, Attorney General, CGCC, CGCC Executive Director Littleton, and BGC (California Abdication of Responsibilities)**

210.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 209 of this Complaint.

211.    Pursuant to IGRA and by virtue of entering the Gaming Compact, the State of California, as well as its officers and agencies, have the power and duty to enforce the Gaming

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L St., STE 250
SACRAMENTO, CA 95811

Compact, including a duty to prohibit and otherwise prevent gaming by persons who are not federally-recognized as a tribal government or its authorized designees.

212.  California and its officials are aware that the Casino has been operating in violation of IGRA, the Gaming Compact and the Tribe's Gaming Ordinance since the hiatus in the government-to-government relationship began in December 2011.

213.  California's duties under IGRA exist independently of the authority or responsibility of the Federal Defendants.

214.  The Attorney General, the CGCC, the CGCC Executive Director, the BGC, and the BGC Chief have the authority and the responsibility to take enforcement against any unlawful gaming activities occurring on the Tribe's Indian lands conducted in violation of the Gaming Compact.

215.  IGRA requires California to take enforcement action to prevent unlawful class III gaming operations at the Casino until the Department recognizes some Tribal governing authority.

216.  To date, California has taken no steps to halt the unlawful gaming activities now taking place at the Tribe's Casino, despite repeated requests by Plaintiffs to do so.

217.  Through its inaction, California has abdicated its responsibilities under IGRA.

218.  California's abdication of its responsibilities has deprived the Tribe of its sole proprietary interest in and responsibility for gaming operations at the Casino; has deprived the Individual Plaintiffs of their ability to protect their rights and defend their interests under the Tribe's federally-approved revenue allocation plan; has deprived the Individual Plaintiffs of their right to protection by the State's law enforcement officers, and constitutes an abdication of California responsibilities under federal law.

219.  California's abdication of its responsibilities has irreparably harmed the Plaintiffs.

220.  The relief requested in this claim is necessary and appropriate in aid of the jurisdiction of this honorable Court and is agreeable to usages and principles of law, within the meaning of 28 U.S.C. § 1651.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that this honorable Court grant the following relief:

1.      Declaratory relief and relief in the nature of mandamus and a mandatory injunction compelling the Department to recognize a governing body of the Tribe, on an interim basis or otherwise, for purposes solely of administering and maintaining the Tribe's government-to-government with the United States within ten (10) days, and further providing that this Court shall maintain jurisdiction over the matter to enforce Defendants' compliance with such relief; and

2.      Declaratory relief that the operation of the Tribe's Casino by individuals not recognized by the Department of the Interior constitutes unlawful gaming under IGRA; and

3.      Declaratory relief and relief in the nature of mandamus and a mandatory injunction compelling the Commission to take enforcement action against any unlawful gaming activities occurring on the Tribe's Indian lands, and further providing that this Court shall maintain jurisdiction over the matter to enforce Defendants' compliance with such relief; and

4.      Declaratory relief and relief in the nature of mandamus and a mandatory injunction compelling California and its officers and agencies to take enforcement action against any unlawful gaming activities occurring on the Tribe's Indian lands conducted in violation of the Gaming Compact, and further providing that this Court shall maintain jurisdiction over the matter to enforce Defendants' compliance with such relief; and

5.      Issue such temporary and preliminary injunctive relief as is necessary to the resolution of this dispute; and

6.      Costs, fees and expenses, and reasonable attorneys' fees and expenses, pursuant to and in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412; and

7.      Such other further relief as this honorable Court may deem just and proper.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**          **CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

1    Respectfully submitted,

2    Dated this 22nd day of September, 2014          FREDERICKS PEEBLES & MORGAN LLP

3

4                                                    /s/    John M. Peebles
                                                        JOHN M. PEEBLES, Attorneys for Plaintiffs

5
                                                     John M. Peebles
6                                                    Steven J. Bloxham
                                                     James Qaqundah
7                                                    FREDERICKS PEEBLES & MORGAN LLP
                                                     2020 L Street, Suite 250
8                                                    Sacramento, California 95811
                                                     Telephone: (916) 441-2700
9                                                    Fax: (916) 441-2067
                                                     jpeebles@ndnlaw.com
10                                                   sbloxham@ndnlaw.com
                                                     jqaqundah@ndnlaw.com
11

12                                                   *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    CASE NO.**

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
SACRAMENTO, CA 95811

1

## VERIFICATION

We, Morris Reid, Dora Jones, Dixie Jackson, Harold Hammond, Sr., Mark Emerick and Janice Devine, named plaintiffs herein, hereby verify and declare under penalty of perjury under the laws of the United States that we have read the foregoing Verified Complaint for Declaratory and Injunctive Relief and know the contents thereof, and that the matters contained in the Verified Complaint are true to our knowledge, except as to those facts that are herein stated on information and belief, and as to those matters we believe them to be true.

We hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Executed on the date(s) and in the location(s) below indicated.

Date: 9/22/2014 , in
Fresno , California

Morris Reid

Date: 9-22-14 , in
Clovis , California

Dora Jones

Date: 9-22-14 , in
Auberry , California

Dixie Jackson

Date: 09-22-2014 , in
Oakhurst , California

Harold Hammond, Sr.

Date: 9-22-14 , in
Oakhurst , California

Mark Emerick

Date: 9/22/14 , in
Madera , California

Janice Devine

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    CASE NO.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE 250
Sacramento, CA 95811